### United States District Court
### District of Massachusetts

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 7 Case No. |
| INOFIN INCORPORATED, | ) | 11-11010-JNF |
| | ) | |
| Debtor. | ) | |
| | ) | |
| MARK G. DEGIACOMO, Chapter 7 | ) | |
| Trustee of the Estate of Inofin | ) | |
| Incorporated, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | 16-10528-NMG |
| | ) | 14-10483-NMG |
| HOLLAND & KNIGHT, LLP and | ) | |
| RICHARD J. HINDLIAN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### MEMORANDUM & ORDER

**GORTON, J.**

Defendants Holland & Knight, LLP ("H&K") and Richard J. Hindlian ("Hindlian") (collectively, "defendants") move for summary judgment on plaintiff's claim of legal malpractice brought in his capacity as Bankruptcy Trustee of the Estate of Inofin, Incorporated. Defendants also move to strike the deposition testimony of Michael Cuomo. For the reasons that follow, defendants' motions will be allowed.

I. <u>**Factual and Procedural Background**</u>

Inofin, Incorporated ("Inofin") was established in 1994. It was in the business of acquiring and servicing subprime loans for used automobiles.  Michael Cuomo and Kevin Mann owned and controlled Inofin.  Mr. Cuomo was its president and Mr. Mann was its Chief Executive Officer.  Inofin raised capital through investor loans with terms of three years and fixed interest rates.  Although Inofin executed investor loan agreements and promissory notes, most of the loans were unsecured.

**A. Inofin's Questionable Loan Practices**

Inofin made loans to startups and also factored loans as follows:

First, in the early 2000s, Messrs. Cuomo and Mann began to loan Inofin investor funds to affiliated automobile and real estate startups ("the startups").  Very few Inofin investors knew of the startups and Mr. Cuomo specifically told his assistant not to advise investors about them.  The Trustee admits that the startups were "financial disasters" and that the loans were a "significant cause" of Inofin's insolvency.

The Massachusetts Division of Banks ("the Division") required Inofin to be licensed in order to operate.  To maintain such a license, Inofin had to submit a report and financial statement to the Division each year.  Pursuant to Division regulations, companies must maintain a net worth of $20,000.

In 2004, the Boston law firm Sullivan & Worcester ("S&W") advised Mr. Cuomo that, for the purpose of measuring net worth for Division reports, the loans to the startups were not "assets". Nevertheless, from 2005 to 2009, Inofin included the startup loans as assets in its financial reports. Defendants submit that, had the reports properly reflected the loans, they would have shown a negative net worth and the Division would likely have shut down Inofin. The Trustee does not dispute that contention.

From the late 1990s until 2006, the accounting firm Sharkansky & Company, P.C. ("Sharkansky") prepared Inofin's annual financial statements that were submitted to the Division. As Sharkansky advised, Inofin's statements in 2003 and 2004 were combined with the startups' statements. In 2005, the principals of Inofin became concerned that if it continued such accounting, it would result in the showing of a negative net worth for Inofin. Consequently, Messrs. Cuomo and Mann purportedly sold some of the startups as part of a scheme to separate the startups' losses from Inofin. After the sham sale, however, Inofin still controlled the startups, the CFO for Inofin continued to handle the books for the startups, their personnel continued to be employees of Inofin and Cuomo and Mann continued to hold themselves out as the owners of the startups.

Mr. Cuomo subsequently tried to persuade Sharkansky that, because some of the startups had been divested, separate financials statements were appropriate.  In 2007, Sharkansky told Inofin that if it did not consolidate the financial statements of Inofin and the startups, the firm would include a $5 million bad-debt reserve for the startup loans on Inofin's balance sheet, resulting in a negative net worth for the company.  Inofin terminated Sharkansky's services and hired a solo certified public account, Richard Tobin, who treated the startup loans as assets in the financial statements.  If the startup loans had been properly accounted for in the reports from 2005 to 2009, they would have accurately reflected Inofin's negative net worth.

Inofin's second questionable loan practice began in 2007. Because it was experiencing cash flow difficulties, Inofin began factoring auto loan receivables with Mid-Atlantic Finance ("MAF").  That allowed Inofin to receive instant cash for the loans.  Taking into account discounts and commissions, however, Inofin lost 8% of the value of the loans.  Even so, Inofin continued to record the factored loans as assets and to report interest income from them.  That falsely inflated Inofin's stated income and assets and understated its expenses.

**B. SEC Investigation and Bankruptcy Petition**

Inofin admits that 1) in 1994 Robert Allison, an attorney from the law Firm of Sherburne, Powers & Needham, P.C. ("SPN"), advised it to treat its promissory notes as securities and to comply with the applicable laws by using a private placement memorandum ("PPM") and 2) in 2003 Ed Woll, an attorney from S&W, forewarned that the notes were securities.  Despite such advice, Inofin did not file an SEC registration statement with respect to the notes or use Form D as required by the Securities Act of 1933 for unregistered securities.

In September, 2009, the Securities and Exchange Commission ("SEC") notified Inofin that it was under investigation.  In May, 2010, the investigation revealed that Inofin had factored approximately $26 million of its loans to MAF.  When Inofin's financial statement was accurately updated in December, 2010, it revealed a negative net worth of $29 million.  The Division issued a cease and desist order against Inofin shortly thereafter.

Creditors of Inofin filed an involuntary Chapter 7 bankruptcy petition against it in the United States Bankruptcy Court for the District of Massachusetts in February, 2011.  The Bankruptcy Court entered an order for relief under Chapter 7 and appointed Mark D. DeGiacomo ("the Trustee") as Trustee of the bankruptcy estate.

The SEC investigation culminated in a civil complaint alleging that Inofin, Mr. Cuomo and others violated anti-fraud securities laws by, among other things, making fraudulent representations to investors.  As a result of that lawsuit, Cuomo and Mann entered into consent orders with the SEC.  The government also brought criminal charges against them for wire fraud, mail fraud and conspiracy which are still pending.

### C. Alleged Legal Malpractice

In September, 2013, the Trustee began an adversary proceeding in the Bankruptcy Court alleging one count of legal malpractice under Massachusetts law.  Defendants answered in due course.

According to the Trustee, H&K and Hindlian, who was then a partner at H&K, were Inofin's primary outside counsel from August, 2006 until the bankruptcy petition was filed in 2011. Hindlian also previously worked at SPN which represented Inofin from 1993 through 1998.  The Trustee alleges that, as of August, 2006, Hindlian "knew the details of Inofin's operations, including its sources and manner of financing".  The Trustee also claims that in 2007 and 2008, Hindlian prepared two preferred stock offerings for Inofin and, in so doing, he "familiarized himself with the relevant securities laws".

The parties agree upon the following facts with respect to defendants' legal advice.  In November, 2008, Inofin requested

-6-

Hindlian's advice on whether it could sell its notes to investors with 401k plans.  In seeking his advice, the principals forwarded to Hindlian an email from the broker-dealer who had proposed the investment which stated that the notes would be unregistered securities.

Although Inofin did not then pursue the investment opportunity, the parties agree that after the exchange concerning 401k plans, Hindlian requested authorization from Mr. Cuomo to prepare a PPM to use with future promissory notes. Hindlian prepared a PPM that referred to the notes as securities and sent it to Inofin in or about February, 2009.  Inofin admits that as of that time Hindlian had advised it that its notes were securities.

It is also undisputed that Mr. Cuomo then told Attorney Hindlian to stop working on the PPM and that Inofin would not use a PPM for its notes.  Hindlian then dropped the matter.  H&K and Hindlian continued to provide legal advice to Inofin until February, 2011 but did not again advise it to comply with securities laws.

The Trustee alleges that, in breach of their duty of care, H&K and Hindlian inadequately advised Inofin with respect to securities laws.  Specifically, after Mr. Cuomo rejected the PPM, defendants purportedly failed to advise Inofin that 1) its notes were securities, 2) the SEC would likely categorize the

notes as securities, 3) it was violating securities law and
4) it was risky not to use PPMs.  The Trustee contends that
defendants' negligence enabled Inofin's business wrongfully to
continue after January, 2009 thus exacerbating its promissory
note debt and other expenses between January, 2009 and February,
2011.  The Trustee claims defendants are therefore liable for
millions of dollars of damages.

Defendants moved to withdraw the reference of the adversary
proceeding in March, 2016 and this Court allowed that motion.
Shortly thereafter, defendants moved for summary judgment and on
June 21, 2016, they moved to strike the deposition testimony of
Mr. Cuomo.  This memorandum addresses both motions.

**II.   Motion to Strike**

### A. Legal Standard

At the summary judgment stage, the Court may consider only
evidence that would be admissible at trial. Fed. R. Civ. P.
56(c)(2).  It is "black-letter law" that impermissible hearsay
cannot be considered for the purpose of summary judgment. Fed.
R. Evid. 802; Davila v. Corporacion De Puerto Rico Para La
Difusion Publica, 498 F.3d 9, 17 (1st Cir. 2007).

Prior testimony of a witness is admissible as an exception
to the hearsay rule under Fed. R. Evid. 804(b)(1) if 1) the
witness is unavailable and 2) the party against whom the
testimony is offered had "an opportunity and similar motive to

develop it" through cross examination. Fed. R. Evid. 804(b)(1).
A witness is considered unavailable in the Rule 804 context if
he invokes the Fifth Amendment and refuses to testify. United
States v. Zurosky, 614 F.2d 779, 792 (1st Cir. 1979).

Witnesses may not, however, offer direct testimony and then
deny the opposing party the opportunity for cross examination by
invoking the Fifth Amendment. S.E.C. v. Ficken, 546 F.3d 45, 53-
54 (1st Cir. 2008). Therefore,

> [a] trial judge may strike a witness's direct testimony
> if he flatly refuses to answer cross-examination
> questions . . . .

United States v. Bartelho, 129 F.3d 663, 673 (1st Cir. 1997).
Although a judge may permit direct examination testimony even if
a witness invokes the Fifth Amendment on cross examination as to
collateral issues, see id. at 673-74, or if counsel "ma[kes] a
tactical decision" to refrain from cross examination, such
circumstances are distinct from "being blocked from cross-
examination . . . ." Zurosky, 614 F.2d at 793 (internal
quotation and citation omitted).

### B. Analysis

The Trustee deposed Mr. Cuomo for about five hours and
defendants conducted their first hour of cross examination on
December 17, 2014. Due to conflicts with Mr. Cuomo's work
schedule and the infamous snow storms of that winter, the
deposition (and thus the cross examination) was not able to be

continued until February 27, 2015.  By that time, however, Mr. Cuomo had been criminally charged and declined to answer any questions, invoking his Fifth Amendment privilege.

Defendants contend that, because they were unable to complete Mr. Cuomo's cross examination, his testimony is inadmissible under Fed. R. Evid. 804(b)(1) and should be stricken.  The Trustee responds that Mr. Cuomo's testimony is admissible with respect to the topics on which defendants were able to conduct cross examination.  Alternatively, he requests that the Court stay this case until the criminal case is resolved.

Mr. Cuomo's invocation of his Fifth Amendment right satisfies the unavailability requirement of Fed. R. Evid. 804. Zurosky, 614 F.2d at 792.  Consequently, the crucial question is whether the single hour of questioning constituted an adequate opportunity for cross examination.  Id.  Defendants' inability to complete the cross examination was not limited to collateral issues and was not a tactical decision.  See Bartelho, 129 F.3d at 673-74; Zurosky, 614 F.2d at 793.  Instead, without any forewarning on the first day of his deposition, Mr. Cuomo completely stifled the remainder of the cross examination on the second day of his deposition.  See Zurosky, 614 F.2d at 793. Therefore, defendants were not afforded an adequate opportunity

to cross examine Mr. Cuomo and his testimony will be stricken from the summary judgment record.

The Trustee's request for a stay of this civil action due to a related criminal case lies solely within this Court's discretion. <u>Microfinancial, Inc.</u> v. <u>Premier Holidays Int'l, Inc.</u>, 385 F.3d 72, 77 (1st Cir. 2004).  In determining if a stay is appropriate, the key question is whether "the interests of justice counsel in favor of such a course." <u>Id.</u> at 78.  Here, the interest of justice weighs against a stay because defendants are not parties to the criminal proceedings and would be unfairly inconvenienced, and perhaps prejudiced, if the instant action were allowed to linger until the criminal action is resolved. <u>See</u> <u>id.</u>  Moreover, the stage of litigation and public and third party interests also weigh against a stay because, even if Mr. Cuomo's testimony were admissible, defendants would be entitled to summary judgment pursuant to the doctrine of <u>in pari delicto</u> as addressed below. <u>Id.</u>  Accordingly, plaintiff's request for a stay will be denied.

### III.   **Motion for Summary Judgment**

#### A. Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." <u>Mesnick</u> v. <u>Gen. Elec. Co.</u>, 950 F.2d 816, 822 (1st Cir. 1991).  The burden is on the moving party to

-11-

show, through the pleadings, discovery and affidavits, "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

If the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The Court must view the entire record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993). Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.

Defendants contend that summary judgment should be granted on the grounds of in pari delicto and because proximate cause is lacking.

**B.  In Pari Delicto**

**1. Legal Standard**

Because the Massachusetts legal malpractice claim in this case is in federal court pursuant to the Court's bankruptcy jurisdiction, the law of the Commonwealth controls the applicable defenses. Baena v. KPMG LLP, 453 F.3d 1, 6 & n.4 (1st Cir. 2006).  The Trustee "stands in the shoes" of Inofin and any defenses that could be raised against Inofin also apply to him. See Gray v. Evercore Restructuring L.L.C., 544 F.3d 320, 322 n.1 (1st Cir. 2008).

In pari delicto, which means "in equal fault", is a defense based on public policy considerations. Baena, 453 F.3d at 6. Massachusetts applies the in pari delicto defense to torts, including legal malpractice, Choquette v. Isacoff, 65 Mass. App. Ct. 1, 2 (2005), with the goal of "prohibit[ing] plaintiffs from recovering damages resulting from their own wrongdoing." Nisselson v. Lernout, 469 F.3d 143, 151 (1st Cir. 2006).

The United States Supreme Court has limited the in pari delicto defense to circumstances where 1) the plaintiff and defendant have "substantially equal responsibility for the wrong [plaintiff] seeks to redress" and 2) barring the claim would not "interfere[] with the purpose of the underlying law or otherwise contravene the public interest." Nisselson, 469 F.3d at 152 (citing Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S.

299, 310-11 (1985)).  Massachusetts courts have adopted these restrictions. Id. (citing Choquette, 65 Mass. App. Ct. at 4-5).

### 2. Analysis

Defendants contend that they are entitled to summary judgment on the grounds of in pari delicto because the fraudulent behavior of the bankrupt corporation, not the purported deficit in defendants' legal advice, extended Inofin's existence and resulted in the precipitous loses incurred from 2009 to 2011.  The Trustee replies that the defense is inapplicable because, when a claim derives from a professional's negligent advice, the in pari delicto doctrine requires that the plaintiff be affirmatively involved in formulating the advice. Because it is agreed that Inofin engaged in questionable accounting practices and failed to treat the notes as securities despite repeated legal advice to do so, the pertinent question is whether, when the record is viewed in the light most favorable to plaintiff, defendants are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

Defendants' contention that all of the alleged misconduct, including Inofin's dubious accounting practices and defendants' legal advice or lack thereof, must be considered in evaluating whether in pari delicto applies is correct.  As another Session of this United States District Court has observed, the parties' responsibility as to the "overall wrongful conduct" is relevant

-14-

for an in pari delicto defense, not their ownership of "the
individual wrongs comprising the greater wrong." Gray v.
Evercore Restructuring L.P., No. 06-cv-11444-RWZ, 2007 WL
3104597, at *8 (D. Mass. Sept. 19, 2007), aff'd sub nom. Gray v.
Evercore Restructuring L.L.C., 544 F.3d 320 (1st Cir. 2008).

When the "overall wrongful conduct" is considered,
defendants are entitled to summary judgment on the grounds of in
pari delicto.  The First Circuit Court of Appeals ("First
Circuit") has determined that, pursuant to the law of the
Commonwealth, if a plaintiff is the primary wrongdoer, in pari
delicto precludes claims against a secondary accomplice for
aiding in the wrong.  Baena, 453 F.3d at 7 (1st Cir.
2006)(citing Choquette, 65 Mass. App. Ct. at 3-4).  In the
present case, Inofin was the primary wrongdoer with respect to
both the duplicitous bookkeeping that allowed it to retain a
license from 2009 to 2011 and the failure to treat the notes as
securities despite legal advice to the contrary in 1994, 2003
and 2009.

The First Circuit has specifically found that
"sophisticated professionals" are still entitled to the in pari
delicto defense when the plaintiff is "at least equally
responsible" for the alleged wrongdoing. Gray, 544 F.3d at 323.
This is illustrated by the First Circuit's decision in Baena,
453 F.3d at 6.  That case involved claims against KPMG

accountants who knew about inaccurate accounting practices at a company and warned certain managers about them but refrained from notifying the company's directors of the practices and provided financial statements that allowed the company to increase its debt by $340 million before going bankrupt. Id. at 4.  Applying Massachusetts law, the Court found that in pari delicto prevented the company, whose senior managers were primarily at fault for the fraudulent records, from recovering from KPMG even though the accountants were aware of and facilitated the wrongdoing. See id. at 7.

Similarly here 1) defendants informed Inofin that its notes were securities and that it should issue the notes in conjunction with a PPM, and 2) when the company elected to ignore the advice, defendants continued to act as its counsel without raising objections.  Yet defendants are not the primary wrongdoers.  Those principally responsible for the fraudulent accounting that enabled Inofin to avoid detection and to precipitate huge loses from 2009 to 2011 were Messrs. Cuomo and Mann, and thus Inofin itself. See Baena, 453 F.3d at 7. Likewise, the officers of Inofin are responsible for its repeated failure to treat the notes as securities despite advice of counsel to the contrary.  Accordingly, even when the undisputed facts are viewed in the light most favorable to

plaintiff, defendants are entitled to summary judgment on the grounds of in pari delicto.

### C. Proximate Cause

#### 1. Legal Standard

Pursuant to Massachusetts law, attorneys have a duty to use reasonable care when advising clients. Glob. NAPs, Inc. v. Awiszus, 457 Mass. 489, 500 (2010).  To prevail on a legal malpractice claim, a plaintiff must show that the attorney breached his duty and the breach proximately caused damages to the client. Id.  Courts often determine whether causation existed "as matter of law at the summary judgment stage." Girardi v. Gabriel, 38 Mass. App. Ct. 553, 559 (1995).

Proximate cause requires more than mere "conjecture or speculation." Borden v. Betty Gibson Associates, Inc., 31 Mass. App. Ct. 51, 55 (1991).  To show proximate cause, a plaintiff must

> demonstrate the probability that he would have reached a more favorable outcome . . .  had [the attorney] exercised adequate skill and care.

Shimer v. Foley, Hoag & Eliot LLP, 59 Mass. App. Ct. 302, 309 (2003).  On the other hand, if the outcome would remain unchanged regardless of the degree of care the attorney exercised, proximate cause is not shown. McCann v. Davis, Malm & D'Agostine, 423 Mass. 558, 561 (1996).

## 2. Analysis

The undisputed facts show that successive counsel repeatedly advised Inofin that the promissory notes should be treated as securities and that it repeatedly ignored such advice.  In 1994, Attorney Robert Allison told Inofin that the notes were securities, worked with Cuomo and Mann to draft a PPM and advised Inofin that the notes were subject to securities laws.  In 2003, Attorney Ed Woll indicated to Inofin that the notes were securities.  In 2008, one of Inofin's investors identified the promissory notes as unregistered securities, likely subject to SEC regulation D.  In 2009, Attorney Hindlian advised Inofin that the notes were securities and asked Mr. Cuomo to authorize a draft PPM for future notes.

In sum, principals of the bankrupt corporation were well-aware that the notes were securities and that, in order to comply with SEC regulation D, they had to be offered in conjunction with a PPM.  Yet, in contravention to recurring advice of counsel, Inofin chose to avoid compliance with securities regulations. See McCann, 423 Mass. at 561.

The sole evidence that plaintiff offers to show that the outcome would have been different if defendants had been more diligent is Mr. Cuomo's inadmissible testimony.  Even if that testimony were considered, it is belied by the repeated warnings to Inofin that the notes were securities which warnings it

-18-

doggedly ignored.  Thus, even if defendants were not entitled to summary judgment on the grounds of in pari delicto, they would be entitled to it because proximate cause is lacking.

## ORDER

For the foregoing reasons, defendants' motions for summary judgment (Docket No. 20) and to strike (Docket No. 36) are **ALLOWED.**

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated November 28, 2016